UNITED STATES DISTRICT COURT
NORTHERN  DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>        Plaintiff,<br><br>        v.<br><br>DONALD V. WATKINS SR., ESQ.,<br>WATKINS PENCOR, LLC,<br>MASADA RESOURCE GROUP,<br>LLC,<br><br>        Defendants,<br><br> and<br><br>DONALD V. WATKINS, P.C.,<br><br>        Relief Defendant. | Civil Action No. _____<br><br>JURY TRIAL DEMANDED |

## COMPLAINT FOR INJUCTIVE AND OTHER RELIEF

Plaintiff Securities and Exchange Commission ("SEC" or "Commission")

files this Complaint and alleges as follows:

1

## OVERVIEW

1.      Between at least 2009 and 2014, Defendants Donald V. Watkins Sr., Esq. ("Watkins") and his companies, Defendant Watkins Pencor, LLC ("Watkins Pencor") and Defendant Masada Resource Group, LLC ("Masada"), fraudulently raised at least more than $6 million in investments relating to Watkins Pencor and Masada's waste-to-energy conversion ventures ("Masada Ventures").

2.      In offering and selling many of these securities — including to several investors who were former or current professional football and basketball players — Defendants misrepresented, among other things, that the investor money would be used to fund Masada and the Masada Ventures, and that the investors would receive a percentage of profits that would be generated and obtained by Masada and its affiliates.

3.      In truth, Defendants used significant portions of the investor funds to pay off Watkins' personal expenses and non-Masada debts and expenses.

4.      Defendants further misrepresented to investors that a large, multinational corporation, Waste Management, Inc. ("Waste Management"), was in the process of acquiring Watkins Pencor, Masada and its affiliates.  Among other things, Defendants told investors that "extensive" due diligence had already been undertaken in connection with that acquisition, that an acquisition would be

closing within several months, that investors would be repaid from acquisition proceeds, and that such an acquisition would reap millions — if not billions — of dollars for Defendants and investors. Indeed, Watkins told at least one investor that the acquisition would "be in the range of $2-$5 billion."

5.     In truth, Waste Management never engaged in any significant due diligence, and there was never any probability of an acquisition by Waste Management, much less one valued in the "range of $2-$5 billion."

6.     Through their conduct, Defendants, directly or indirectly, engaged in acts, practices, and courses of business which have constituted and will constitute violations of Sections 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77e(a)] and Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## JURISDICTION AND VENUE

7.     The Commission brings this action pursuant to Sections 20 and 22 of the Securities Act [15 U.S.C. §§ 77t and 77v] and Sections 21(d) and 21(e) of the Exchange Act [15 U.S.C. §§ 78u(d) and 78u(e)], to enjoin the Defendants from engaging in the transactions, acts, practices, and courses of business alleged in this Complaint, and transactions, acts, practices, and courses of business of similar

purport and object, for disgorgement and prejudgment interest, civil penalties and for other equitable relief.

8.      This Court has jurisdiction over this action pursuant to Sections 20 and 22 of the Securities Act [15 U.S.C. §§ 77t and 77v] and Sections 21(d), 21(e) and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e) and 78aa].

9.      Defendants and Relief Defendant, directly and indirectly, made use of the mails, the means and instruments of transportation and communication in interstate commerce and the means and instrumentalities of interstate commerce in connection with the transactions, acts, practices, and courses of business alleged in this Complaint.

10.     Venue lies in this Court because Defendant Watkins was a resident of this District between at least 2009 through 2014, and a number of the transactions, acts, practices, and courses of business constituting violations of federal securities laws occurred in this District.   For example, a number of the investors and prospective investors resided or worked within this District during that time period.

### DEFENDANTS

11.     Since 2003 until at least 2014, Defendant Watkins has resided in the Atlanta, Georgia area.  Watkins has held the position of Chairman and CEO of Masada since 2005 and is the sole owner of Watkins Pencor.  Watkins received his

4

law degree from the University of Alabama School of Law in 1973, and is a member of the Alabama bar. Watkins was also a member of the Washington, D.C. bar, but was suspended for non-payment of dues. Watkins does not actively practice law at the present time.

12.     Defendant Watkins Pencor is a Delaware limited liability company which lists its principal address in Birmingham, Alabama. Watkins formed Watkins Pencor in or about 1998. During all times relevant to this action, Watkins owned and controlled this entity.

13.     Defendant Masada is an Alabama limited liability company which lists its principal address in Birmingham, Alabama. Masada is a company that purportedly owns certain patents for technology that supposedly converts organic waste to fuel. Since at least approximately 2009, Watkins Pencor, Masada and its affiliated companies ("the Masada Affiliates") have purportedly been involved in various waste-to-energy conversion ventures both in the United States and internationally ("Masada Ventures").

14.     Since at least approximately 2009, Watkins has purported to be the majority owner and the manager of Masada and the Masada Affiliates through his ownership of an intermediate entity, Pencor Orange Corp., which is itself owned

by Watkins Pencor.   As a result, Watkins managed and controlled Masada, the Masada Affiliates and the Masada Ventures for all times relevant to this action.

## RELIEF DEFENDANT

15.   Relief Defendant Donald V. Watkins, P.C. ("Watkins PC") is an Alabama professional corporation that was solely owned and controlled by Watkins.  While that entity historically served as Watkins' law firm, it has more recently been used as a purported "platform" for Watkins' various business ventures, such as the Masada Ventures.  The funds that Defendants' raised from investors, supposedly for Masada, were deposited into the Watkins PC bank account.

## FACTS

### Defendants' Background

16.   Masada has been in existence for decades.  It was started by a friend of Watkins and was initially in the business of establishing and selling infrastructure in cable, cellular communications, and electronic home security.  It later moved into the waste-to-energy arena, attempting to capitalize on technology patents it supposedly owns relating to the conversion of waste to energy.

17.     In or about December 2005, Watkins became the Chairman and CEO of Masada and subsequently entered into two agreements in order to own 100% of Masada.

18.     In or around 2005, Watkins began steering the business toward developing an international waste management business.  This included attempts to establish relationships and engage in international outreach with respect to waste-management markets, and to capitalize on the intellectual property held by Masada.  As of the end of 2014, Watkins claimed that Masada had "a market reach" in 47 countries.

19.     Defendants also purportedly engaged, at least for some period of time, several engineers and professionals in an effort to move Masada's business forward.

20.     In or about 2009, Watkins purportedly sought to purchase a majority interest in a National Football League franchise.  Watkins touted this effort in speaking to investors of Watkins Pencor and Masada.

21.     Beginning as of at least 2009, Watkins began having difficulty meeting substantial personal and non-Masada debt obligations — which included hundreds of thousands of dollars in annual payment obligations owed to financial institutions and approximately $100,000 per year in annual alimony obligations.

Indeed, he reported to at least one bank that, for 2009, he had total income of approximately $300,000, but debt and payment obligations that year — unrelated to Masada — of over $1.35 million dollars.

22.    In addition to the foregoing obligations, as early as 2009, Watkins and or his law firm, Watkins PC, also incurred or were obligated to pay other substantial obligations, including but not limited to: (a) hundreds of thousands of dollars for Watkins' personal tax liabilities; (b) hundreds of thousands of dollars to attorneys defending Watkins in a 2008 lawsuit arising from his ownership in TradeWinds Airline, Inc., an aviation cargo business ("the TradeWinds Litigation"); (c) hundreds of thousands of dollars in refund payments to a legal client; and (d) tens of thousands of dollars per month in credit card bills.

23.    In 2011, Watkins defaulted on approximately $2.75 million of debt that he owed in connection with his partial ownership of a Birmingham-based bank Alamerica Bank, Inc. and its holding company, Alamerica Bancorp, Inc.

24.    In an effort to obtain funds to cover his financial problems, and to persuade certain existing investors into renewing their investments, Watkins made a variety of misrepresentations about the Masada investments.

**Defendants Fraudulent Offering of**
**Economic Interests and Promissory Notes**

25.    Beginning in at least 2009 and continuing through 2014, Watkins raised money for Masada from investors in two primary ways:  the offer and sale of (1) "economic interests" and (2) promissory notes.

26.    First, between 2009 and 2014, Watkins raised over $3 million in investments from several different investors — many of whom were former or current professional athletes — through the sale of "economic interests" in Watkins Pencor.

27.    With respect to these "economic interests" investments, Watkins Pencor and an investor entered into a two-page "Purchase Agreement and Irrevocable Assignment of Economic Interests," that was signed by the investor and Watkins as "Manager[,] Watkins Pencor, LLC."

28.    Defendants told investors that their "economic interests" entitled them to receive a fixed percentage of the cash distributions from Watkins Pencor, Masada and the Masada Affiliates to which Watkins was entitled. Over time, the percentage assigned to each investment varied; some investors received a 1% interest in exchange for an investment of $200,000, while others paid as much as $1,000,000 for a 1% interest.

9

29.     The Purchase Agreements, given to investors, state that the "investment in the economic interests involves a high degree of risk and is suitable only for persons or entities that have no need for liquidity in the investment and can bear the loss of their entire investment."

30.     While the document itself is silent as to use of proceeds, beginning as of at least 2009, Watkins represented to investors in other communications— both before and after their investments — that their money would be and had been used to fund Masada and the Masada Ventures.

31.     Second, Watkins also raised at least $3 million from the issuance of promissory notes between 2009 and 2011.

32.     These investors received two–page promissory notes, which Watkins signed "for Masada Resource Group, LLC" as its "CEO and President." The notes not only promised both a return of principal and interest, but also, provided to the investors a fixed percentage of the "economic interests" relating to Masada and its affiliates.

33.     The notes expressly specified that the proceeds from the notes were "solely for business purposes related to Masada Resource Group, LLC."

**Defendants Divert and Misuse the Masada Investors' Money**

34.    With respect to both the "economic interests" investments and the promissory notes, Defendants had the investment proceeds wired or deposited directly into the bank account of Relief Defendant Watkins, PC.  All investor funds were pooled together.

35.    Contrary to Defendants' representations to investors, however, Watkins used the investor funds to pay his personal and non-Masada expenses, as well as to refund an earlier investor's money.

36.    For example, on March 26, 2009, an investor — an NFL football player and his wife (collectively, "NFL Investor") — invested $1 million in Masada through a purchase of "irrevocable economic interests" in Watkins Pencor, Masada and the Masada Affiliates.

37.    As of March 25, 2009, the Watkins, PC account had a negative balance of approximately - $4,500.

38.    Following receipt of the $1 million investment from the NFL Investor in the Watkins, PC bank account, Watkins had the money disbursed as follows:  (a) two checks for $111,472.28 and $54,836.34, respectively, to pay on his personal debt obligations incurred in connection with his ownership of Alamerica Bank; (b) a wire transfer of $25,000 to his then-girlfriend for their "House Account;" (c) a

wire transfer of approximately $500,000 to refund a  law client of Watkins and Watkins, PC; (d) a check for $14,500 to his ex-wife as "March 2009 alimony plus loan repayment;" (e) a payment of $20,753.07 to Cessna Finance Corp. for his personal aircraft; and (f) a payment of $41,278.62 on an American Express credit card bill.

39.    Similarly, following another professional football player's investment of $500,000 in "economic interests" on or about June 4, 2009— and deposit of that amount into the Watkins, PC account — Watkins caused the following payments to be made: (a) $108,239 on or about June 10, 2009 to pay for his personal debt obligations relating to his ownership of Alamerica Bank; and (b) $226,000 on or about June 11, 2009 to the U.S. Treasury for his 2007 personal tax liability obligations.

40.    On or about May 14, 2010, another investor — a former professional basketball player (the "NBA Investor") — invested $1 million in Masada through a promissory note.

41.    That note specifically stated that the "debt evidenced by this Note was made and transacted solely for business purposes related to Masada Resource Group, LLC."   However, Defendants used a significant amount of the NBA Investor's funds for purposes other than Masada business purposes.

42.     On May 13, 2010, prior to receipt of the NBA Investor's funds, Watkins, PC had a total of $4,623.19 in its bank account.

43.     Following the wiring of the $1 million investment by the NBA Investor into the Watkins, PC bank account, Watkins used the funds for the following:  (a) $750,000 to an earlier investor who wanted a refund of his Masada investment; and (b) $41,491.14 to Cessna Finance Corp. for his personal airplane.

44.     Watkins made additional misrepresentations to investors after they made their investments.

45.     For example, on January 15, 2011, Watkins wrote an email to the NFL Investor — who was seeking a refund of his investment — reassuring the NFL Investor that the "investment funds were put to work for his benefit in Masada project development activities and related expenses."

46.     Similarly, as late as 2014, Watkins advised Masada investors that the "overwhelming majority of the [economic interest investors'] money was used to aggressively drive Masada's economic growth in the international marketplace."

### Misrepresentations Regarding the Waste Management Acquisition

47.     Beginning as of at least early April 2011, Defendants, in connection with the offer or sale of the "economic interests," the promissory notes and the

13

renewals thereof, began misrepresenting that Watkins Pencor, Masada and the Masada Affiliates were undergoing due diligence by Waste Management.

48.     Defendants told investors and potential investors that Waste Management was looking to acquire certain of the Defendants and their affiliates, that the acquisition was likely to occur within several months' time, and that the investors would be paid back from the proceeds of the acquisition by Waste Management ("Waste Management Acquisition").

49.     According to representations made by Defendants, Ben Barnes, the former Texas Lieutenant Governor, was shepherding negotiations between Masada and Waste Management, with Waste Corporation of America ("WCA") also involved in those negotiations.

50.     Over the next year, Watkins made a series of misrepresentations to Masada investors that — taken both individually, as well as in their totality — falsely suggested that negotiations to complete the Waste Management Acquisition were serious, advanced and progressing to an acquisition within several months.

51.     In an April 3, 2011 email to investors, Watkins stated:

Apparently, Barnes's discussions with Waste Management ("WM") have already begun. These talks are at the highest levels of WM and focus on a strategic relationship with Masada. We have started working on the structure of Masada's deal with Barnes and WM. We expect that WM's final deal will include an acquisition of all technologies owned or licensed by Masada . . . . Barnes expects that

the WM deal will also include an option to acquire Masada's worldwide IP rights and other international assets.

52.     In May 2011, to persuade the 2010 promissory note investors to renew their investments — by extending the due dates for the notes' repayment, thereby permitting Defendants to avoid having to repay on them — Watkins told investors that Masada:

> expected the contemplated acquisition to close in the 4th quarter of this year. The loan would be repaid at the closing from the proceeds from the WM acquisition transaction. Please let us know if you consent to the renewal of the promissory note.

53.     In a 2011 year-end investor report to Masada investors, which was dated January 20, 2012 and prepared by Watkins, Watkins told investors:

> In March 2011, . . . Watkins [and another person] met with former Lt. Governor Ben Barnes, head of the Barnes Group, LLC (collectively referred to as "Barnes"), to discuss a business alliance with Waste Management, Inc. Apparently, Barnes's discussions with WM had already begun, as the talks to develop a strategic relationship with Masada quickly reached the highest levels of WM.

54.     In an August 21, 2012 email to investors, Watkins stated:

> We have a second meeting with WMI tentatively scheduled for later this week in Houston. . . .
> WMI has indicated an interest in moving forward with Masada in deploying our CES OxyNol process and Polycrack technology, both domestically and internationally.

55.     Contrary to these representations to investors, in fact, Waste Management's "interest" in Masada — to the extent there was any — never progressed past an initial meeting that lasted only approximately 30-45 minutes. That meeting, which Watkins attended, was in **August 2012, more than a year after** Defendants began telling investors that there had been due diligence and that an acquisition was coming within the next several months.

56.     Neither during that meeting, nor at any time thereafter, did Waste Management ever give any indication of an intention to move forward on an acquisition transaction with Masada.

57.     As a result, Waste Management never conducted any due diligence into acquiring Masada, much less any substantial or "extensive due diligence."

58.     Watkins made additional material misrepresentations regarding the potential Waste Management Acquisition and how investor funds would be used complete that acquisition.

59.     For example, in May 2011, Watkins contacted the NBA Investor — who had previously invested $1 million in May 2010 via a promissory note — seeking to: (a) renew and extend the earlier May 2010 promissory note, and (b) ask for another $1 million investment loan.

60.     Specifically, on May 12, 2011, Watkins asked the NBA Investor to renew his May 2010 promissory note, representing, among other things that: (a) Masada was engaging in confidential acquisition discussions with Waste Management, (b) "extensive due diligence" had already begun "in earnest" with respect to that acquisition, (c) the acquisition transaction was expected to close before the end of the 4th quarter of the year, (d) the promissory note would be repaid with the proceeds from the Waste Management Acquisition, and (e) Waste Management "will probably acquire all of Masada's US assets and take an option on the company's international assets. We are seeking an all-cash exit deal."

61.     By email to the NBA Investor the next day on May 13, 2011, Watkins sought a second $1 million investment, stating:

> As we gear up for the anticipated Masada-Waste Management transaction, **we will be expending significant sums of money on NY, San Francisco, and Atlanta investment bankers and lawyers.** I had planned on borrowing $1 million for this special purpose from one of my commercial bankers later today or Monday. We will be repaying the loan at the closing of the WM transaction. If you are interested in lending the money instead, we will borrow the $1 million from you at the same 10% per annum interest rate we are paying on your current loan . . . We will retire this special purpose loan at the closing of the WM transaction or within 12 months, whichever comes first. (emphasis added).

62.     The NBA Investor agreed both to "renew" the 2010 promissory note, plus invest an additional $1 million with Defendants via a second promissory note.

63.    In that second May 2011 promissory note for the new $1 million investment, the maturity date for the new investment was expressly based "upon closing of a confidential contemplated acquisition transaction between [Waste Management] and Masada Resource Group, LLC or May 18, 2012, whichever occurs first."

64.    The second promissory note — which Watkins signed "for Masada Resource Group, LLC" as "CEO and President" — also expressly provided that it was "made and transacted solely for business purposes related to Masada Resource Group, LLC and affiliated entities/persons."

65.    Contrary to his representations, Watkins did not use the NBA Investor's funds that were wired to the Watkins PC bank for "investment bankers or lawyers" for the purported Waste Management Acquisition.

66.    On May 20, 2011, before the receipt of the aforementioned second $1 million investment from the NBA Investor, the Watkins PC bank account contained a negative balance of -$786.67.

67.    Following the wiring of that $1 million investment on May 23, 2011 into the Watkins PC bank account, Watkins disbursed the NBA Investor's money for, among other things, the following:  (a) $150,000 to attorneys defending him in the TradeWinds Litigation; (b) $90,049.32 to pay American Express credit card

bills; (c) $50,000 to his former wife for "partial alimony;" (d) $41,816 to his then-girlfriend for their "House Account;" and (e) $255,703 to the U.S. Treasury for his personal tax obligations.

68.     In May 2012, Watkins again asked the NBA Investor to renew his May 2010 and May 2011 promissory notes, for an additional 12 months or upon the completed acquisition by Waste Management, Inc., at an interest rate of 10 percent per annum.

69.     In soliciting these renewals, Watkins represented that the Waste Management Acquisition was "currently in the due diligence phase" of the transaction and that he expected it to close in the 3rd or 4th quarter of that year. The NBA Investor agreed to the renewals of his investments.

70.     In an email to the NBA Investor on September 14, 2012, Watkins further stated that:

> WMI has already informed us that they will be moving forward with us on three fronts. We are negotiating an upfront payment that will be large enough to: (a) recoup our total investment in Masada, (b) repay [NBA Investor's] two separate $1 million loans with interest, and (c) return [NBA Investor's] original $2 million investment . . . together with a substantial premium on this investment amount . . . .
>
> **We expect the total value of the WMI deal to be in the range of $2-$5 billion in cash and stock** over the life of the Masada-WMI business alliance. (emphasis added).

71.    In fact, Waste Management had never so "informed" or committed to any transaction with Defendants — much less engaged in any negotiations for an "upfront payment" — and certainly never gave any indication of an acquisition that would be valued in the "$2-$5 billion" range.

72.    In or about February 2014, Watkins asked the NBA Investor for an additional $1 million investment into Masada, representing that the entity was worth "in excess of $1 billion" and claiming it was about to be acquired by a Saudi prince, with an initial cash payout of $100 million. Watkins further represented that "[i]n order to accomplish the tasks necessary to complete this deal, Masada estimates that it will require an additional  capital infusion of $1 million. Because of your demonstrated loyalty and trust since 2007, I want to get this $1 million from you."

73.    The NBA Investor declined to invest additional funds.

### COUNT I—FRAUD

**Violations of Section 17(a)(1) of the Securities Act [15 U.S.C. § 77q(a)(1)]**
**(Against Defendants Watkins, Watkins Pencor and Masada)**

74.    Paragraphs 1 through 73 are hereby realleged and incorporated herein by reference.

75.    By their conduct, Defendants, in the offer and sale of the securities described herein by the use of the means and instruments of transportation and

communication in interstate commerce or by use of the mails, directly or indirectly, employed devices, schemes, and artifices to defraud, all as more particularly described above.

76.   In engaging in such conduct, Defendants acted with scienter, that is, with intent to deceive, manipulate or defraud or with severely reckless disregard for the truth.

77.   By reason of the foregoing, Defendants, directly or indirectly, have violated and, unless enjoined, will continue to violate Section 17(a)(1) of the Securities Act [15 U.S.C. § 77q(a)(1)].

## COUNT II—FRAUD

**Violations of Section 17(a)(2) and 17(a)(3) of the Securities Act
[15 U.S.C. §§ 77q(a)(2) and 77q(a)(3)]
(Against Defendants Watkins, Watkins Pencor and Masada)**

78.   Paragraphs 1 through 73 are hereby realleged and incorporated herein by reference.

79.   By their conduct, Defendants, in the offer and sale of the securities described herein, by the use of the means and instruments of transportation and communication in interstate commerce and by use of the mails, directly and indirectly:

a.     obtained money and property by means of untrue statements of material facts and omissions to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and

b.     engaged in transactions, practices, and courses of business that would operate and did operate as a fraud or deceit upon the purchasers of such securities.

80.    In engaging in such conduct, Defendants acted with scienter, that is, with intent to deceive, manipulate or defraud or with reckless disregard for the truth, and/or negligently engaged in the conduct described above.

81.    By reason of the foregoing, Defendants, directly and indirectly, have violated and, unless enjoined, will continue to violate Section 17(a)(2) and 17(a)(3) of the Securities Act [15 U.S.C. §§ 77q(a)(2) and (3)].

## COUNT III—FRAUD

**Violations of Section 10(b) of the Exchange Act**
**[15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder**
**[17 C.F.R. § 240.10b-5]**
**(Against Defendants Watkins, Watkins Pencor and Masada)**

82.    Paragraphs 1 through 73 are hereby realleged and incorporated herein by reference.

83.    Defendants, in connection with the purchase and sale of securities described herein, by the use of the means and instrumentalities of interstate commerce or by use of the mails, directly and indirectly:

     a.    employed devices, schemes, and artifices to defraud;

     b.    made untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and

     c.    engaged in acts, practices, and courses of business that operated or would operate as a fraud and deceit upon the purchasers or holders of such securities.

84.    In engaging in such conduct, Defendants acted with scienter, that is, with an intent to deceive, manipulate, or defraud or with a severely reckless disregard for the truth.

85.    By reason of the foregoing, Defendants, directly or indirectly, have violated and, unless enjoined, will continue to violate Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5thereunder [17 C.F.R. 240.10b-5].

## COUNT IV

**Unjust Enrichment**
**(Against Relief Defendant Watkins PC)**

86.     Paragraphs 1 through 73 are realleged and incorporated by reference herein.

87.     Significant investor funds were used for the benefit of Relief Defendant Watkins PC, including $500,000 to refund a client's retainer fee.

88.     Watkins PC did not provide anything of value in return for the investor funds and was thus unjustly enriched by the receipt of those funds.

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully prays that the Court:

I.

Make findings of fact and conclusions of law in accordance with Rule 52 of the Federal Rules of Civil Procedure.

II.

Issue a permanent injunction enjoining Defendants, directly or indirectly, and their agents, servants, employees, attorneys, and all persons in active concert or participation with them who receive actual notice of the order by personal service or otherwise, and each of them:

24

A.    from violating, directly or indirectly, Section 17(a) of the Securities Act [15 U.S.C. §§ 77e(a), 77e(c) and 77q(a)], and

B.    from violating, directly or indirectly, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. 240.10b-5];

## III.

Issue an Order requiring Defendants to disgorge, on a joint and several basis, all ill-gotten gains obtained as a result of the conduct alleged in this Complaint, plus pay prejudgment interest thereon.

## IV.

Issue an Order requiring the Relief Defendant to disgorge all unjust enrichment or other ill-gotten gains received as a result of the conduct alleged in this Complaint, with prejudgment interest.

## V.

Issue an Order, pursuant to Section 20(d) of the Securities Act and Section 21(d)(3) of the Exchange Act, imposing civil monetary penalties.

## VI.

Issue an Order that retains jurisdiction over this action in order to implement and carry out the terms of all orders and decrees that may have been entered or to entertain any suitable application or motion by the Commission for additional relief within the jurisdiction of this Court.

## VII.

Grant such other and further relief as this Court may deem just, equitable, and appropriate in connection with the enforcement of the federal securities laws and for the protection of investors.

RESPECTFULLY SUBMITTED,

/s/ Paul Kim
Paul Kim
Senior Trial Counsel
Georgia Bar No. 418841
kimpau@sec.gov

M. Graham Loomis
Regional Trial Counsel
Georgia Bar No. 457868
loomism@sec.gov

Walter Jospin
Regional Director, Atlanta Regional Office
Georgia Bar. No.  405450
jospinw@sec.gov

COUNSEL FOR PLAINTIFF
U.S. SECURITIES AND EXCHANGE COMMISSION
950 East Paces Ferry Road, N.E., Suite 900
Atlanta, Georgia 30326
B: (404) 842-7600
F: (404 842-7679